## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

FEDERAL DEPOSIT INSURANCE CORPORATION )
AS RECEIVER FOR BRADFORD BANK )
3501 Fairfax Drive )
Arlington, Virginia 22226 )
                          )
                 Plaintiff, )
v. )
                          )
DALLAS R. ARTHUR, )
413 Fox Chapel Drive )
Lutherville (Baltimore County), Maryland 21093 )    Civil Action No.: _____
                          )
MARY BETH TAYLOR, )
1262 Dockside Court )
Baltimore City, Maryland 21224 )
                          )
GILBERT D. MARSIGLIA, )
11965 Mays Chapel Road )
Timonium (Baltimore County), Maryland 21093 )
                          )
 and )
                          )
JOHN O. MITCHELL, III, )
18 Meadow Road, )
Baltimore (Baltimore County), Maryland 21212 )
                          )
                 Defendants. )

## COMPLAINT AND DEMAND FOR JURY TRIAL

     Plaintiff, the Federal Deposit Insurance Corporation as Receiver for Bradford

Bank ("FDIC-R"), for its Complaint states as follows:

## I.    INTRODUCTION

     1.    The Federal Deposit Insurance Corporation ("FDIC") brings this case in

its capacity as Receiver for Bradford Bank ("Bradford" or the "Bank") of Baltimore,

Maryland,  pursuant to authority granted by 12 U.S.C. § 1821.

2.     The FDIC-R seeks to recover damages in excess of $7.4 million from former Bradford officer and director Dallas R. Arthur ("Arthur"); former officer Mary Beth Taylor ("Taylor") (collectively, Arthur and Taylor are referenced herein as the "Officers"); and former non-officer directors Gilbert D. Marsiglia ("Marsiglia") and John O. Mitchell, III ("Mitchell") (collectively, Marsiglia and Mitchell are referenced herein as the "Non-Officer Directors").  The Officers and Non-Officer Directors are collectively referenced herein as the "Defendants."  The FDIC-R reserves the right to amend this Complaint to allege and claim additional damages.

3.     The Officers breached their fiduciary duties to the Bank and were negligent and grossly negligent by, among other things, recommending and/or approving commercial real estate ("CRE") and acquisition, development, and construction ("ADC") loans from July 5, 2006 through October 24, 2007 (the "Loss Transactions")[1] that violated the Bank's Loan Policy (the "Loan Policy") and prudent, safe, and sound lending practices.  The Officers are liable for the damages that the Bank suffered as a result of their negligence, gross negligence and breach of fiduciary duties.

4.     The Non-Officer Directors breached their fiduciary duties to the Bank and were negligent and grossly negligent by, among other things, approving the Loss Transactions that violated the Loan Policy and prudent, safe and sound lending practices. The Non-Officer Directors are liable for the damages that the Bank suffered as a result of their negligence, gross negligence and breach of fiduciary duties.

5.     The actions and omissions that give rise to the Defendants' liability include, among other things, extending credit in violation of the Loan Policy; providing

---

[1]     The Loss Transactions are identified in Exhibit A attached hereto and incorporated herein.

#484637

financing for speculative ventures in which the borrowers invested little or no money of their own; extending credit to borrowers who were not creditworthy or were known to be in financial difficulty; approving and originating loans that violated applicable loan-to-value ("LTV") ratio policies and regulations; extending credit based on inadequate or stale information about the financial condition of prospective borrowers and guarantors and without adequately analyzing cash flow, debt service coverage, and other critical financial information; approving and originating speculative CRE and ADC loans despite known adverse economic conditions in the local real estate market; and failing to supervise, manage, conduct and direct the business and affairs of Bradford to ensure compliance with prudent principles of banking.

6.     By recommending and approving the Loss Transactions despite their numerous flaws, Defendants exposed the Bank to excessive and imprudent risks and thereby breached their fiduciary duties to the Bank and acted with negligence and gross negligence.  Defendants' actions and inactions form the basis of their liability and were the direct and proximate cause of over $7.43 million in damages that Bradford suffered and FDIC-Receiver now seeks to recover.   Accordingly, the FDIC-Receiver asserts claims for negligence and gross negligence against all Defendants. In this lawsuit, the FDIC-R does not seek to collect upon outstanding loans, but rather seeks to collect damages flowing from the Defendants' negligence and/or gross negligence and breaches of fiduciary duties, which include, among other things, lost operating capital, lost profits, and lost investment opportunities.

#484637

## II.   THE PARTIES

7.      The FDIC is a corporation and instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835(a).  On August 28, 2009, Bradford was closed by the Office of Thrift Supervision ("OTS"), which appointed the FDIC as Receiver.  The FDIC in its capacity as Receiver is empowered to sue and complain in any court of law pursuant to 12 U.S.C. § 1819. Pursuant to 12 U.S.C. §1821(d)(2)(A)(i) the FDIC, by operation of law, succeeded to all rights, titles, powers and privileges of Bradford, and, among others, the depositors, account holders, and stockholders of the Bank.  In this action, the FDIC-R seeks to recover damages resulting from the tortious conduct of the Defendants.

8.      Arthur was President of the Bank from March 26, 2001, a director from July 18, 2001, and a member of the Bank's Loan Committee (the "Loan Committee") from February 20, 2002 until the Bank failed.  On information and belief, he resides in Lutherville, Maryland.

9.      Taylor was the Bank's Senior Executive Vice President of Commercial Lending from July 26, 2001, until she resigned on November 17, 2008.  In that capacity, she oversaw Bradford's commercial real estate lending and originated and administered loans.  Her employment agreement provided a salary and commissions on new business, which from April 1, 2005 until she resigned included a commission of ten percent of all fee income generated by the Bank's Commercial Loan Department (whether or not she originated the loan).  Her commission income ranged from $96,900 to $100,091 annually during the relevant time period. On information and belief, she resides in Baltimore, Maryland.

-4-

10.     Marsiglia was a director of the Bank from February 19, 2003, and a member of the Loan Committee from July 23, 2003, until the Bank failed.   On information and belief, he resides in Timonium, Maryland.

11.     Mitchell was a director of the Bank from April 20, 1983, and a member of the Loan Committee from February 29, 2002, until the Bank failed.  On information and belief, he resides in Baltimore, Maryland.

12.     During all relevant times, the Bank was under the direction and control of Defendants, there was virtually no change in the composition of the Bank's directors and officers, and Defendants dominated the lending activities of the Bank.

## III.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction for this action pursuant to 12 U.S.C. § 1811, *et seq.*; 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345. The FDIC is a corporation organized and existing under the laws of the United States of America, and brings this action in its receivership capacity.  Actions to which the FDIC is a party are deemed to arise under the laws of the United States. The FDIC, including in its capacity as Receiver, has the authority to sue and complain in any court of law. 12 U.S.C. § 1819.

14.     The Court has personal jurisdiction over Defendants who, at all relevant times, were either residents of, or conducted the business of Bradford in the State of Maryland.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as all or substantially all of the acts charged herein occurred in this District and the FDIC-R's claims arose in this District.

#484637

## IV.  BACKGROUND

**A.     Defendants Pursued a Strategy of Rapid Growth Through Funding High Risk Loans**

16.     Bradford was founded in Baltimore, Maryland on January 1, 1903, as a mutual savings and loan association named Bradford Loan and Savings Association.  In 1935, it changed its name to Bradford Federal Savings and Loan Association, and in June 2002 changed its name again to Bradford Bank.  At all relevant times, OTS was Bradford's primary federal regulator.  Bradford always was headquartered in Baltimore.

17.     Beginning in 2005, under Arthur's leadership, and while Taylor was the head of Commercial Lending, the Bank embarked on an aggressive growth strategy, with the ultimate goal of converting the Bank from a mutual to a public stock institution. Arthur told Marsiglia, Mitchell, Taylor and the other officers and directors that they would all personally make a lot of money by converting the Bank to a public stock corporation.

18.     In 2005, Arthur and the Board set a goal for the Bank to reach total assets of $1.0 billion within a three-year period.  In order to achieve this goal, the Bank sought to significantly increase its concentration in speculative CRE and ADC loans and acquire other banks.  In CRE loan transactions, the bank takes a security interest in real property used for commercial purposes as a source of repayment for a loan related to that property. CRE loans are inherently risky, as many loans are made to developers, builders, and speculators, who have little or no equity in the project and who may have several concurrent projects, making their incomes subject to fluctuations in real estate values.

19.     ADC loans are a type of CRE loan in which the loan proceeds are used to acquire commercial real property, and/or develop it by grading it, installing utilities and

roads, and/or financing construction of a commercial project, such as single family residences, apartments, condominiums, or commercial space. ADC loans are inherently even riskier and more susceptible to fluctuations in real estate values than basic CRE loans. Fluctuations in real estate values are foreseeable risks for banks that make CRE and ADC loans.

20.     The national economy began to exhibit problems as early as March 2006, when investment expenditure on residential structures began to decline. Investment growth and residential housing slowed to near zero in late 2005, before turning negative in the first quarter of 2006.

21.     In 2007, as real estate markets softened, the Bank's high-risk ADC loans unsurprisingly experienced cash flow problems, which led to high loan delinquencies and loan losses. The Bank's classified assets increased 161.6 percent from $10.397 million as of September 30, 2006 to $27.2 million as of December 31, 2007. Due to the deficient risk management and credit administration allowed by Defendants in recommending and approving CRE and ADC loans, as real estate markets in Bradford's area of operation continued to decline, classified assets continued to increase and the Bank's financial condition deteriorated. In 2009, the Bank's classified assets reached a total of $41.6 million—a 52.9 percent increase since December 2007.

22.     Bradford's portfolio of ADC loans increased from $60 million in 2005 to $80 million in 2006 and $90 million in 2007. By comparison, overall, the banks in the Baltimore metropolitan statistical area insured by the FDIC decreased their portfolio of ADC loans from $4.0 billion in 2005 to $3.2 billion in 2007. The decline in lending among Baltimore area banks corresponded with problems in the Baltimore housing

-7-

market as early as March 2006. Bradford Bank did not follow the trend to reduce ADC exposure as did the other financial institutions in the Baltimore area.

23.     Making CRE and ADC loans in a volatile real estate market renders a bank vulnerable to changes in market conditions and requires vigilant adherence to sound lending practices. It is imperative that the risks inherent in CRE and ADC loans be managed by, at a minimum, stringent underwriting and adherence to internal credit policy and prudent lending standards, meaningful and informed deliberation, management oversight, strategic planning, risk assessment and monitoring of the loans. This is particularly true when a bank, such as Bradford, has a growing concentration in CRE and ADC loans.

24.     During the time period that the Defendants recommended and/or approved the Loss Transactions, they knew or should have known the risks attendant to making CRE and ADC loans and that Bradford's lending was concentrated in CRE and ADC loans. Accordingly, Defendants knew or should have known that they needed to exercise a heightened degree of care when recommending and/or approving CRE and ADC loans, including the Loss Transactions.

25.     Instead of exercising heightened care or even ordinary care, however, the Defendants, among other things, failed to follow the Bank's internal policies and prudent, safe, and sound lending practices by recommending and/or approving the Loss Transactions without adhering to adequate underwriting and credit administration policies. Defendants routinely failed to inform themselves adequately of the relevant risks in connection with their recommendation and/or approval of loans, failed to prevent violations of the Bank's own policies, overlooked glaring deficiencies in loan

#484637

presentations, and instead, without meaningful deliberations, recommended and/or approved the Loss Transactions, which they knew or should have known would likely cause substantial losses to the Bank.

26.     In 2007, the Bank continued to increase ADC and CRE lending and recommended and/or approved high-risk ADC and CRE loans that violated the Loan Policy, including loans with blatant underwriting deficiencies and Loan Policy violations.

**B.     Bradford Loan Policy**

27.     The Loan Policy relevant to the FDIC-R's claims and that governed the recommendation and approval of the Loss Transactions was approved by the Bank's Board of Directors on or about February 15, 2006, and amended on or about February 28, 2007.  The Loan Policy was designed to protect the Bank from shortcomings such as those described herein.  The Loan Policy required diligent underwriting in conformity with state and federal law, close monitoring of concentrations of credit, and rigorous documentation and prudent evaluation of borrower and project risk.  In approving loans including the Loss Transactions, however, Defendants routinely overlooked and repeatedly failed to enforce the Loan Policy's provisions.  Defendants' failure to abide by the Loan Policy included violations of the following requirements set forth in the Loan Policy:

> (a)     Borrowers and guarantors were required to provide current financial information and tax returns for each new loan and renewal;

> (b)     Individual borrower and guarantor creditworthiness were required to be supported by personal financial statements less than one year

old and that included a balance sheet, annual income information, and the applicant's signature;

(c)    Corporate obligors were required to provide financial statements and tax returns for two years;

(d)    An appraisal was required for all loans collateralized by real estate;

(e)    The LTV ratio allowed for a loan was 65 percent for a raw land loan, 75 percent for a land development loan, and 80 percent for a commercial, multi-family, or other non-residential loan; and

(f)    Credit files were required to include the borrower's and guarantor's financial statements, tax returns, income verification, background information, cash flow and earnings, and the credit officer's analysis of the obligor's ability to repay the loan.

28.    The Bank's Board of Directors delegated responsibility for the review of proposed loans to the Loan Committee.  The Loan Committee was the primary safeguard for ensuring that Bradford's policies (including the Loan Policy) and procedures were maintained and enforced.  Arthur, Marsiglia, and Mitchell dominated and controlled the Loan Committee from 2002 to the Bank's failure.  During that time, there were no formal procedures for Loan Committee meetings and there was no quorum requirement. Proposed loans were approved by a majority vote of members present with little to no discussion of such loans by the Loan Committee.

### *Requirements Applicable to All Loans*

29.    The Loan Committee was provided with full authority to approve or decline loan requests.   The Loan Policy required that each member of the Loan

Committee be presented with a loan presentation package for each extension of credit to be reviewed by the Loan Committee.  Upon approval of any loan requests, the loan presentation package had to be documented with the approved terms and conditions of the loan approval.  Any changes to the initial approval of a loan by the Loan Committee had to be subsequently reviewed and approved by the Loan Committee.

30.     Throughout the relevant time period of the FDIC-R's claims, the Loan Policy established guidelines and standards for underwriting, reviewing and approving loans, including the Loss Transactions.  The applicable provisions of the Loan Policy remained the same throughout the time period relevant to the FDIC-R's claims, unless otherwise noted herein.

31.     The Loan Policy provided general requirements that applied to all loans, including, among other things, that:  (a) loans had to be supported by satisfactory financial information, credit information, and analysis; (b) repayment sources of the loan could not be based solely on the value of the collateral but had to have an existing source of cash flow to service the debt; (c) loans had to be based primarily on the financial strength, repayment ability, source of repayment and/or collateral quality of the borrower, and not solely supported by the collateral value or the financial strength of the guarantor; and (d) loans had to supported with proper documentation, including information supporting the borrowers' and guarantors' ability to repay the loans, current financial statements and income tax returns, and credit reports to support the extension of credit.

32.     The Loan Policy also required guarantees to mitigate a loan applicant's deficiencies.  However, the guaranty could not be used as a substitute for deficiencies in an applicant's character or credit history.  The Bank required guarantees from the

#484637

principal owners or stockholders who owned in excess of 20 percent of a closely held business, and from all partners to a partnership.  All personal guarantees had to be evidenced by a current financial statement, accompanied by current tax returns and a copy of the corporate resolutions authorizing the guaranty.

33.    Under the Loan Policy, credit underwriting included the following criterion of credit worthiness:  (a) the general integrity and business reputation of the borrower and the guarantors; (b) the history, earnings, experience and repayment capabilities of the borrower and guarantors; (c) an assessment of whether there was adequate equity and acceptable financial condition of the loan obligors; (d) whether there was a secondary source of repayment and a measure of value of collateral; and (e) favorable economic industry factors.  The Loan Policy also required that undesirable features of each loan be documented in writing.

### Requirements Applicable to CRE and ADC Loans

34.    The Loan Policy established further guidelines and standards for underwriting, reviewing, and approving all real estate loans and construction loans, including CRE and ADC loans.

35.    The Loan Policy specified the following underwriting policies and guidelines for ADC loans, including, among other things, that:  (a) no distribution of loan proceeds could be made until the borrower invested the required equity investment in the development; (b) interest reserves were to be used only for the purpose for which they were established; and (c) at all times the funds remaining in the loan account were to be sufficient to complete the development.

#484637

*Loan Approval Structure and Limits*

36.    Pursuant to the Loan Policy, the Loan Committee had authority to approve all loans that exceeded the lending authority of the Bank's President ($750,000 for loans approved in 2006 and $1,000,000 for loans approved in 2007).   All of the Loss Transactions were presented to the Loan Committee for approval because the amount of each Loan Transaction exceeded the lending authority of the President.

37.    The loan presentation package presented to the Loan Committee included information regarding the amount of the proposed loan, the aggregate debt of the borrower seeking the loan, the purpose of the loan, the proposed maturity date, the sources of repayment (with each loan having two sources of repayment), the pricing of the loan, the guarantors of the loan with summarized financial information, the conditions of the loan and a description of the borrower's operation and sufficient information to establish the credit worthiness of the borrower.

38.    For each proposed loan, the loan officer prepared a loan presentation package that included a credit memo describing the purpose of the loan and a description of the proposed borrower and guarantors.  A credit analyst also prepared a financial analysis of the proposed loan that included financial information on borrowers' and guarantors' balance sheets, income statements, personal financial statements, profitability and debt-service-coverage information, and comments on LTV and/or loan-to-cost ("LTC") ratios.  The loan presentation package also included a loan submission sheet that summarized the important information from the loan officer's credit memo and the credit analyst's financial analysis.  If a loan was approved by the Loan Committee, Taylor, as

chief lending officer, and one member of the Loan Committee would sign the loan submission sheet.

**C.    Defendants' Negligent and/or Grossly Negligent Acts**

39.    As officers and directors of Bradford, Defendants had duties to follow the Loan Policy and exercise due care in recommending and/or approving the Loss Transactions.

40.    In exercising their responsibilities as the officers recommending the loans and/or as the directors approving the loans, each of the Defendants was charged with acting in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believed to be in the best interests of the Bank; ensuring that the Bank's policies were followed; taking reasonably prudent steps to ensure that he or she did not approve imprudent credit extensions or loans; acting in an informed and deliberative manner in reviewing and analyzing applications and supporting documentation for each of the Loss Transactions approved; and ensuring that the Loss Transactions were properly documented, underwritten, and otherwise satisfied the Bank's internal credit policies as well as prudent, safe, and sound lending practices. Instead, as detailed herein, in recommending and/or approving the Loss Transactions, each Defendant acted with the lack of due care, in disregard for the best interests of the Bank, and in a manner in which a reasonable and prudent person would know would likely result in injury to the Bank.

41.    Numerous critical underwriting deficiencies were apparent on the face of the documentation provided to the Defendants in connection with their recommendation and/or approval of the Loss Transactions. In many instances, exceptions to the Bank's

lending requirements were not documented or justified by compensating factors as required by the Loan Policy.  Defendants routinely failed to assess the repayment abilities of the borrowers and guarantors, made loans based on incomplete and stale financial information, made loans considered undesirable under the Loan Policy, exceeded maximum LTV and/or LTC ratios, disregarded and/or overlooked red flags showing that borrowers and guarantors did not have sufficient assets to repay loans, and otherwise violated the Loan Policy and prudent, safe, and sound lending practices, as more fully detailed in this Complaint.  Nevertheless, the Defendants, with indifference and without reasonable inquiry, recommended and/or approved the Loss Transactions.

42.    The Defendants' repeated violations of the Loan Policy and prudent, safe, and sound lending practices occurred throughout the lending process.  The officers who recommended and/or approved the Loss Transactions were negligent, grossly negligent, and breached their fiduciary duties.  The Non-Officer Directors who approved the Loss Transactions were negligent, grossly negligent and breached their fiduciary duties. Exhibit A attached hereto is a chart that identifies the borrowers[2], amount, approval date, and the Defendants who recommended or approved each of the Loss Transactions.

43.    But, for the Defendants' wrongful conduct, Bradford would not have made the Loss Transactions on the terms presented, as alleged below.

**D.    Loss Transactions**

    **i.    <u>Loan A</u>**

---

[2]    The names of the borrowers and guarantors have been withheld to protect the privacy of the individuals.  The names of the borrowers and guarantors will be provided to the Defendants during or after service of the Complaint.

-15-

#484637

44.     On March 8, 2006, Taylor recommended and Arthur and Marsiglia approved a $690,625 loan ("Loan A") to A-1 and his wife, A-2.   On August 30, 2006, Taylor recommended and Arthur and Marsiglia approved an increase of the loan to $1 million.   The proceeds of the loan were to be used to purchase two parcels of land, containing 63.7 acres located in the Upper Marlboro area of Prince George's County in Maryland.   The guarantor was A-3, a Maryland corporation 100 percent-owned by A-1. A-3 was a real estate management and development company for projects developed by A-1.   The primary source of repayment of the loan was to be the sale of the residential lots.

45.      The Defendants recommended and/or approved Loan A despite the red flags in the loan presentation package for Loan A, among other things:

   (a)    The borrowers had clearly identified financial weaknesses that did not support the loan request;

   (b)    The financial statements from the borrowers and guarantor were not current; and

   (c)    The LTC ratio of 86 percent exceeded the raw land policy limit of 65 percent set forth in the Loan Policy.

46.     The deficient underwriting and credit analysis was apparent from the material in the loan presentation package provided to the Loan Committee.   Had Defendants on this loan insisted on the required underwriting and credit analysis, it would have demonstrated, among other things, that the borrowers could not support repayment of the loan, there was no adequate source of repayment and an exception was not warranted for the LTC ratio, and Loan A should not have been approved.

-16-

#484637

47.     The loan officer's credit memo and the accompanying financial analysis provided widely conflicting assessments of the strengths and weaknesses of borrowers A-1 and A-2 and guarantor A-3.   The discrepancy between the credit memo and the financial analysis required that any reasonable officer and/or director decline to recommend and/or approve Loan A.   The Loan Policy required current and adequate personal financial statements on all individual borrowers and guarantors.   All corporate guarantors were required to furnish a current financial statement, and two years of tax returns.   Loan A did not comply with the Loan Policy in that personal financial statements furnished by borrowers A-1 and A-2 and guarantor A-3 were dated December 2004, which was 14 months before the loan was underwritten.   The Bank did not receive current financial statements from the borrowers and the guarantor as required by the Loan Policy when the loan was initially approved in March 2006.

48.     The loan submission sheet signed by the Loan Committee on March 30, 2006, required that the borrowers and guarantors provide updated financial statements. When the Loan Committee considered the modification to increase the amount of Loan A to $1 million in August 2006, the financial analysis noted that no new financial information on borrowers A-1 and A-2 and guarantor A-3 had been provided.   Taylor recommended and the Loan Committee members approved the increase in the principal amount of the loan by approximately $310,000 based on the same, stale December 2004 financial statements previously furnished by the borrowers and guarantor A-3.   The consideration of the stale financial statements violated the Loan Policy as well as the specific conditions imposed by the Loan Committee on the March 30, 2006 loan submission sheet.

#484637

49.     The collateral for Loan A was a first lien on the 63.7 acres of land, with additional security provided by the guaranty of A-3.  The credit memo provided that in no event would the amount disbursed under the loan exceed the lesser of (1) 75 percent of the "as is" appraised value of the property or (2) 75 percent of the acquisition costs of the property.  When the loan was initially approved in March 2006, the projected LTC was 65 percent ($690,625 loan/$1,062,500 land acquisition cost) for the two parcels. However, after the loan was approved only the 58.78-acre parcel of the property was purchased using loan proceeds from the March 2006 approval of the loan.   The acquisition of this one parcel of the land resulted in an LTC ratio of 86 percent ($690,625 loan/$800,000 land acquisition cost) which exceeded the raw land policy limit of 65 percent of cost or value, whichever is less.  This 86 percent ratio also conflicted with the statement in the credit memo that loan disbursements would not exceed 75 percent of the acquisition cost of the property.

50.     In August 2006, the Loan Committee approved the modification in Loan A increasing the loan amount by $310,000 to approximately $1 million.  The business loan agreement executed in connection with the initial approval of Loan A in March 2006 also included the requirement that the amount disbursed under the loan not exceed the lesser of (1) 75 percent of "as is" appraised value of the property or (2) 75 percent of the acquisition costs of the property.  Upon execution of the loan modification agreement in August 2006, the LTC ratio for the entire 63.7 acres of land was 94 percent ($1 million loan/$1,062,000 acquisition cost), which exceeded the limits set forth in the business loan agreement and the 65 percent ratio limit for raw land loans set forth in the Loan Policy. The modifications to Loan A approved by the Loan Committee in August 2006 violated

the Loan Policy and the limits set forth in the loan agreement with borrowers A-1 and A-2.

51.     The Defendants also violated the Loan Policy by recommending and/or approving Loan A in March 2006, and then recommending and/or approving a $310,000 increase in the loan in August 2006 based on outdated financial information from the borrowers and guarantor.  A reasonable officer and/or director would have required current financial statements and tax returns in order to review the credit worthiness of the borrowers and the guarantor.  Given the absence of current financial information and the Defendants' ignorance of the LTC ratio on Loan A, the Defendants acted recklessly in recommending and/or approving Loan A in March 2006 and then recommending and/or approving the modifications to Loan A in August 2006.

52.     Borrowers A-1 and A-2 defaulted on Loan A and did not repay the loan in full.

53.     The deficient underwriting, credit analysis and Loan Policy violations on Loan A were apparent from the credit memo, financial analysis and loan submission sheet provided to the Loan Committee, as well as the business loan agreement from March 2006.  Had the recommending and approving Defendants Taylor, Arthur and Marsiglia performed their due diligence and insisted on the required underwriting and credit analysis, it would have demonstrated, among other things, that the repayment sources identified were speculative and vulnerable to a deteriorating real estate market, that the borrowers' and guarantor's credit worthiness did not support the loan amount, and that the LTC ratio of the subject property violated the Loan Policy and the Loan

Committee's previously imposed limit on loan disbursements for Loan A.  As such, Loan A should not have been recommended or approved.

54.     In recommending and/or approving Loan A, Defendants failed to perform their duties, with reckless disregard for the consequences, by failing to comply with the Bank's lending policies, prudent underwriting and their own fiduciary duties.  As a direct and proximate result of the actions and omissions of Defendants Taylor, Marsiglia and Arthur with respect to Loan A, the Bank suffered damages in an amount estimated to be no less than $226,083.

**ii.     Loan B**

55.     On or about July 5, 2006, Taylor recommended and Arthur, Marsiglia, and Mitchell approved a $2.578 million loan ("Loan B") to borrowers B-1, B-2 and B-3, three individuals who worked on development projects.   On April 27, 2007, Defendants recommended and/or approved an increase in Loan B to $3.554 million.

56.     The stated purpose of Loan B was to refinance several parcels of land that had been acquired by the borrowers, and to acquire additional parcels, all of which comprised an assemblage totaling approximately 43 acres of land, for a development of a 58-lot residential subdivision in the Middle River area of eastern Baltimore County, Maryland.  The guarantors were B-4 and B-5, both Maryland limited liability companies. B-4 was 100 percent owned by B-5.  B-5 was owned equally by B-1, B-2 and B-3.  Both B-4 and B-5 were newly formed entities, and B-4 was created to hold the real estate being financed by the loan.  The primary source of repayment of the Loan was to be the sale of the residential lots.

#484637

57.     The Defendants recommended and/or approved Loan B despite the red flags in the loan presentation package for Loan B, among other things:  (a) the borrowers had clearly identified financial weaknesses that did not support the loan request; (b) the analysis of the borrowers' global cash flow requirements and contingent liabilities was inadequate; and (c) guarantors B-4 and B-5 lacked the financial capacity to support the loan.  The deficient underwriting and credit analysis was apparent from the credit memo and the materials in the loan presentation package provided to the Loan Committee.  Had the Defendants on this loan insisted on the required underwriting and credit analysis, it would have demonstrated, among other things, that the repayment sources identified were speculative, the borrower and guarantors could not support the loan, there was no adequate source of repayment, and Loan B should not have been approved.

58.     The loan officer's credit memo and the accompanying credit analyst's financial analysis provided widely divergent assessments of the strengths and weaknesses of borrowers B-1, B-2 and B-3.  The discrepancies between the credit memo and the financial analysis required that any reasonable officer and/or director decline to recommend or approve Loan B.

59.     The credit memo identified the financial strength of the borrowers and their real estate investment activities as the primary reason for recommending the request.  The accompanying financial analysis clearly contradicted this statement.  It noted that borrower B-3's personal financial statement did not list approximately $600,000 of liabilities even though the credit analyst was aware of such liabilities based on his review of other information provided.  The purported financial strength of borrower B-3 was based on outdated information:  a financial statement for B-3 that was signed in February

-21-

2005, 14 months prior to the financial analysis, and tax returns only through 2004. The stale financial statement revealed that B-3's accessible net worth was only $1.2 million. The Loan Policy required that personal financial statements for individual borrowers be less than one year old. In April 2007, when the Loan Committee approved a $976,000 increase in Loan B, updated financial information was provided to the Bank that confirmed the weaknesses previously identified in July 2006. Specifically, the financial analyst referenced a personal financial statement for B-3 dated June 30, 2006 showing that B-3's accessible net worth had decreased to $469,000. Without a complete, updated and accurate disclosure of contingent liabilities and an updated financial statement, the Defendants were not in a position to accurately determine the financial strength of borrower B-3. Based on the financial information actually provided in the loan presentation package, Defendants also could not rely on borrower B-3 as a reliable source of repayment for Loan B.

60. The credit analysis of borrower B-1 also revealed that B-1 had failed to include all contingent liabilities in his outdated, May 2004 personal financial statement. The consideration of B-1's stale financial statement violated the Loan Policy, which required financial statements less than one year old. Defendants also overlooked the Loan Policy requirement that Borrower B-1 furnish two years of current tax returns, in that B-1 furnished tax returns only through the 2003 tax year. The financial analysis noted that B-1's accessible net worth was $0, after the deduction of personal property, personal residences that were jointly owned, and investments in various business entities that were not guarantors on loan B. Without a complete, updated and accurate disclosure of contingent liabilities and a current financial statement, the Defendants could not

accurately determine the financial strength of borrower B-1.  Based on the information actually provided in the loan presentation package, the Defendants could not rely on B-1 as a reliable source of loan repayment.

61.     The financial analysis reported that borrower B-2 presented investments in real estate totaling $7.3 million.  However, B-2's financial statement was deficient in that B-2's ownership interests in various development entities were not disclosed and no contingent liabilities were listed even though the credit analyst noted that B-2 was most likely liable as a guarantor for any debt associated with the investments noted in the financial statement.  The financial analysis also calculated B-2's accessible net worth as $0 after the deduction of personal property, personal residences that were jointly owned, and investments in various business entities that were not guarantors on the loan.  The tax returns furnished by borrower B-2 (2002-2004) did not comply with the Loan Policy because they were not current returns.   Without a complete, updated and accurate disclosure of contingent liabilities of B-2, the Defendants were in no position to determine the financial strength of B-2.  Based on the financial information actually presented in the loan presentation package, Defendants also could not rely on borrower B-2 as a reliable source of repayment for Loan B.

62.     The limited accessible net worth of the borrowers was clearly noted on the loan submission sheet.   The Loan Policy for complex financing arrangements or commercial customers required applicants provide sufficient, dependable and current financial information, including income and contingent liability data, supporting repayment of the credit.  However, the financial analyst identified unknown contingent

liabilities for the borrowers.  The absence of detailed contingent liability data for the borrowers on Loan B was a violation of the Loan Policy.

63.     Guarantors B-4 and B-5 were shell entities that had no accessible net worth, and therefore provided no reliable source of repayment of Loan B.  There was no secondary or tertiary source of payment stated on the loan submission sheet.

64.     The Loan Policy stated that lot loans are limited to the lesser of 75 percent of cost or value.  The loan amount was $2,578,840 and the land acquisition cost was $2,278,000 resulting in a LTC ratio of 113 percent.  Loan B did not comply with this provision of the Loan Policy.

65.     Borrowers B-1, B-2 and B-3 defaulted on Loan B and did not repay the loan in full.

66.     The deficient underwriting, credit analysis and Loan Policy violations on Loan B were apparent from the loan submission sheet, credit memo and credit analysis furnished to the Loan Committee.  Defendants recommended and approved Loan B when it was apparent, among other things, that there was no adequate source of repayment, no adequate source of collateral, that the repayment sources identified were speculative and vulnerable to a deteriorating real estate market, that the borrowers' and guarantors' credit worthiness did not support the loan amount, and that the LTC ratio exceeded the Loan Policy limits.  As such, Loan B should not have been recommended or approved.

67.     In recommending and/or approving Loan B, Defendants failed to perform their duties, with reckless disregard for the consequences, by approving Loan B without complying with the Bank's lending policies, prudent underwriting and their own fiduciary duties.  As a direct and proximate result of the actions and omissions of

-24-

Defendants Taylor, Marsiglia, Mitchell and Arthur with respect to Loan B, the Bank suffered damages in an amount estimated to be no less than $1,442,000.

### iii.   Loan C

68.     On September 6, 2006, Taylor recommended, and Marsiglia and Mitchell approved, an $8.475 million participation loan ("Loan C") to borrower C-1, a development company.  Bradford participated in 44.84 percent (or $3,800,000) of the $8.475 million total loan amount for loan C.  The proceeds of Loan C were to be used to acquire and develop 42 single-family lots and 72 townhouse lots in a  subdivision in Cambridge, Dorchester County, Maryland.   The guarantor was C-2, who was the president and 100 percent owner of C-1.  The stated repayment source of the loan was the sale of houses.

69.     Defendants Taylor, Marsiglia, and Mitchell approved Loan C despite flagrant red flags that, if properly reviewed, according to the Loan Policy, should have resulted in disapproval of Loan C.

70.      The credit memo and the accompanying financial analysis provided widely divergent assessments of the strengths and weaknesses of the borrower and guarantor and overlooked critical red flags.  The discrepancy between the credit memo and the financial analysis required that any reasonable officer and/or director decline to recommend and/or approve Loan C.

71.     Borrower had acquired the 30.01 acres in the project in September 2005 for the total purchase price of $1,700,000.  However, the appraisal of the property received by the Bank in September 2006 valued the property, as is, at $5.7 Million, a 332 percent appreciation in value in over just one year.  Given the substantial appreciation in

value, the Defendants should have questioned the validity of the appraisal before recommending and/or approving Loan C, but they did not.  The credit memo references the appraisal dated June 15, 2006, but failed to point out that (a) the company that prepared the appraisal was not on the list of the Bank's approved appraisers; and (b) the appraisal noted that the market had slowed in comparison to past years of record real estate demand, but the demand for single-family housing in Cambridge was still there. The appraisal did not explain how the demand was still there, but pointed out that Cambridge had an existing population of 11,000 residents, and there were 6,600 new homes in the pipeline at that time.  The appraisal noted that a National Association of Homebuilders monthly survey reported a drop of 6.5 percent in new home sales in 2006, and pointed out that the Maryland Association of Realtors had reported that the average price of a housing unit in Dorchester County fell 42 percent from May 2005 to May 2006.

72.    The borrowers and guarantor on Loan C also did not serve as adequate sources of repayment of Loan C.  The financial analysis noted that borrower C-1 had a stated net worth of only $4.2 million, and $49 million in contingent liabilities.  Guarantor C-2 had only $2.2 million in accessible net worth, and $49 million in contingent liabilities according to the financial analysis.

73.    The Bank failed to receive current financial statements and tax returns from Borrower C-1 as required by the Loan Policy.  Although the loan request was approved on September 6, 2006, the latest financial statement provided by the Borrower was from 2005, and the latest tax return was from 2004.  The Loan Policy required two years of current tax returns and a financial statement less than one year old.  Given the

market conditions, at a minimum, the Defendants should have required June 2006 interim financial statements to have been received and made part of the analysis.

74.     Furthermore, the financial analysis reported significant unfavorable ratings in gross profit margin, cash, liabilities and net worth when borrower C-1 was compared to the industry averages in these categories compiled by The Risk Management Association (RMA).   RMA industry comparisons are a collection comparative financial data derived from more than 150,000 financial statements of businesses provided to commercial banks.   Banks routinely use RMA comparisons in the financial analysis of loan borrowers and guarantors.   The financial analysis pointed out that these weaknesses were not offset by favorable comparisons in operating expenses, operating profit margin, profit before taxes, total current assets and fixed assets.   The uniform credit analysis (UCA) cash flow revealed net cash flow after operations of negative $12,285,000 in 2005 for borrower C-1.

75.     Guarantor C-2 also provided little strength to the loan request.   The latest financial statements provided by guarantor C-2 were from December 2005 and the latest tax returns furnished for C-2 were from 2004.   The Loan Policy required two years of current tax returns and a financial statement less than one year old.   In light of the market conditions at that time, at a minimum, the Defendant should have required June 2006 interim financial statements from guarantor C-2 to have been received as part of the credit analysis.   The financial statement for C-2 is also unclear in identifying which contingent liabilities relate to Borrower C-1.   The adjusted gross income levels of C-2 also were grossly insufficient to support additional debt.   The financial analysis reported adjusted gross incomes of $444,000 in 2003 and $197,000 in 2004.   Personal cash flow

also was inadequate based on cash available for living of $2,000 and additional debt service of negative $161,000.

76.     Loan C also did not comply with the Loan Policy requirement that land development loans are limited to a 75 percent LTV ratio.  The loan submission sheet clearly stated that the subject property was appraised "as is" at $5,700,000 and "as developed" at $9,700,000.  Given the loan amount of $8,475,000, the LTV ratio of Loan C was 149 percent "as is" and 87 percent "as developed."

77.     Borrower C-1 defaulted on Loan C and did not repay the loan in full.

78.     The deficient underwriting, credit analysis and Loan Policy violations on Loan C were apparent from the loan submission sheet, credit memo and credit analysis furnished to the Loan Committee.  Defendants recommended and approved Loan C even though it was apparent, among other things, that there was no adequate source of repayment or adequate collateral, that the repayment sources identified were speculative and vulnerable to a deteriorating real estate market, that the borrower's and guarantor's credit worthiness did not support the loan amount, and that the LTV ratio exceeded the limit for development loans.  As such, Loan C should not have been recommended or approved.

79.     In recommending and/or approving Loan C, Defendants failed to perform their duties, with reckless disregard for the consequences, by failing to comply with the Bank's lending policies, prudent underwriting and their own fiduciary duties.  As a direct and proximate result of the actions and omissions of Defendants Taylor, Marsiglia and Mitchell with respect to Loan C, the Bank suffered damages in an amount estimated to be no less than $3,260,000.

### iv.     **Loan D**

80.     On May 23, 2007, Taylor recommended and Arthur, Marsiglia, and Mitchell approved a $3.6 million loan ("Loan D") to borrower D-1, a development corporation, to acquire and construct houses on seven lots in Harford and Howard Counties, Maryland.  Of the total loan amount, $1.44 million was to be used for land acquisition and $2.16 million was to be used for construction.  The primary source of repayment was stated to be the sale of lots and completed houses.

81.     Loan D was guaranteed by D-2 and D-4, the owners of borrower D-1, together with their spouses, D-3 and D-5.  Two additional guarantors, D-6 and D-7, were limited liability companies owned by D-2 and D-4.

82.     The Defendants approved Loan D despite flagrant red flags that, if properly researched and reviewed, as required by the Bradford Loan Policy, should have resulted in Loan D not being recommended and/or approved.  The credit memo and the accompanying financial analysis provided widely divergent assessments of the strengths and weaknesses of borrower D-1.  The discrepancies between the credit memo and the financial analysis required that any reasonable officer and/or director decline to recommend and/or approve Loan D.

83.     The financial analysis identified several specific weaknesses in borrower D-1's financial condition including:  (a) operating profit that was $404,000 in 2006 compared to $2,078,000 in 2005 and (b) D-1's unfavorable performance in 2006 as compared to RMA averages in gross profit margin, operating profit margin and profit before taxes.  The financial analysis noted that the reduction in gross profit was of concern and that turnover in inventory was slow.  D's outstanding obligations on other

loans also had increased to $70.4 million in 2006 compared to $59.5 million in 2005 and $41.4 million in 2004. Although the financial analysis noted that borrower D-1 had seller take-back notes from developers and loans from private investors to help finance development, D-1 had reported only $40,000 in interest expense in 2006 versus $978,000 in 2005 and $736,000 in 2004. Given the substantial increase in D-1's loan obligations from 2004 to 2006, the interest expense should have increased substantially as well. The discrepancy in interest expenses in 2006 versus prior years should have prevented any further consideration of the loan by the Loan Committee and Taylor until the discrepancy was resolved.

84.    The financial analysis also identified other concerns in D-1's history, current cash flow, and capacity to generate cash through its operations. In each of these areas, D-1 did not meet its expectations or industry standards. The financial analysis reported the company's poor payment history as reflected in the increasing amounts of accounts payable as a liquidity concern. The credit analyst noted unfavorable comparisons to RMA averages in cash, fixed assets, total current liabilities, net worth and debt to worth ratio for D-1. The financial analysis also identified significant reductions in interest expense, office salaries, dividends and net loss of personal investments as raising significant concerns about the viability and cash flow of the guarantors and their ability to provide support to the credit request. Based on the weaknesses noted in the financial analysis, borrower D-1 was not qualified to take on additional debt.

85.    Although providing a secondary source of repayment was identified as the strength of the guarantors, the financial analysis revealed substantial concerns regarding the guarantors' financial capabilities. Guarantors D-2 and D-4, principals in D-1,

acknowledged that they were both contingently liable on various debts owed by D-1 that totaled $7.4 million in 2006.  Although the financial statements furnished by D-2 and D-3 stated that each guarantor had a net worth of $11 million, the failure to provide detailed information regarding the contingent liabilities would render the guarantees to have little value.  With the limited information provided, there was no way to calculate the level of non-cash expenses to determine the potential available cash to support D-1.  The financial analysis identified no other source of repayment.

86.     The 2006 personal financial statement for guarantors D-3 and D-4 did not comply with the Loan Policy in that it did not include a balance sheet and statement of assets and liabilities.  The Bank did not have current financial information on borrower D-1 in that the latest financial statement that it received for D-1 was dated December 2005.  The Bank failed to receive financial statements dated within a year of consideration of Loan D as required by the Loan Policy.  The financial analysis confirmed that the Bank failed to obtain any financial statements or tax returns for corporate guarantors D-6 and D-7.

87.     Loan D also violated the Loan Policy in that the Bank did not receive proper appraisals for four of the seven lots comprising the subject property.  The credit memo did not mention any appraisals, but stated that the loan is conditioned upon receipt of appraisals of 75 percent LTV for unsold lot loans and 80 percent LTV for presold units.  The Loan Policy required that the LTV ratio for unsold lot loans be the lesser of 75 percent of cost or value, and the LTV for presold units be the lesser of 80 percent of cost or value.  The Bank received appraisals for Lots 37 and 38 with values of $610,000 and $540,000 respectively based on comparable home sales.  No adjustments were made to

account for the fact that Lots 37 and 38 were unfinished lots, and there is no analysis of the appraisals by the Defendants. Similarly, the Bank received an appraisal for Lot 69 of $625,000 based on comparable home sales. No adjustments were made to account for the fact that Lot 69 was an empty lot. Defendants violated the Loan Policy by failing to ensure that the Bank received proper appraisals that supported the purported value of its collateral.

88.     Borrower D-1 defaulted on Loan D and did not repay the loan in full.

89.     The deficient underwriting, credit analysis and Loan Policy violations on Loan D were apparent from the credit memo, financial analysis and loan submission sheet submitted to the Loan Committee. Had the recommending and approving Defendants Taylor, Arthur, Marsiglia and Mitchell done their due diligence and insisted on the required underwriting and credit analysis, it would have demonstrated, among other things, that there was no adequate source of repayment and no adequate source of collateral, that the repayment sources identified were speculative and vulnerable to a deteriorating real estate market, that the borrower's and guarantors' credit worthiness did not support the loan amount, and that the appraisals did not support the valuation of the collateral. As such, Loan D should not have been recommended or approved.

90.     In recommending and/or approving Loan D, Defendants failed to perform their duties, with reckless disregard for the consequences, by failing to comply with the Bank's lending policies, prudent underwriting and their own fiduciary duties. As a direct and proximate result of the actions and omissions of Defendants Taylor, Arthur, Marsiglia and Mitchell with respect to Loan D, the Bank suffered damages in an amount estimated to be no less than $955,000.

#484637

v.     **Loan E**

91.     On July 11, 2007, Taylor recommended and Marsiglia approved a $2.6 million loan ("Loan E") to borrowers E-1 and E-2, two individual developers.   The proceeds of the loan were to be used to finance land deposits and development of 51 lots in a subdivision in Easton, Talbot County, Maryland.   The guarantors were E-3 and E-4, two Maryland corporations, and E-5, a Maryland limited liability company.   E-3, E-4 and E-5 were owned 100 percent by borrowers E-1 and E-2.

92.     The stated purpose of Loan E was for a $2.6 million revolving line of credit to be used by the borrowers to fund deposits on land purchases, development and pre-development expenses, as well as other expenses as approved by the Bank.   The line of credit was collateralized by a first lien indemnity deed of trust on two sections of recorded, developed and/or partially developed residential townhouse lots in the Lakelands at Easton subdivision.   The stated sources of repayment of the Loan were (1) lot sales and (2) cash flow from the guarantors.   The initial draw on the line of credit was $1,785,577, of which $1,397,000 was used to refund a deposit to homebuilder NVR on another project.

93.     Loan E was seriously flawed.   Marsiglia and Taylor disregarded flagrant red flags that, if properly researched and reviewed, as required under the Loan Policy, would have caused Loan E to be declined.   The credit memo and the accompanying financial analysis provided widely conflicting assessments of the strengths and weaknesses of the borrowers and guarantors, and overlooked critical economic red flags. The discrepancies between the credit memo and the financial analysis required that any reasonable officer and/or director decline to recommend and/or approve Loan E.

94.     Borrowers E-1 and E-2 acquired the subject lots from homebuilder Lennar Homes.  The credit memo pointed out that the 51 lots in the subject property were located behind other lots in the subdivision, and thus would be less attractive to potential buyers. In 2006, Lennar Homes publicly expressed concern over the deterioration in the housing industry and was taking aggressive steps to strengthen itself.   The credit memo's statement that one of the borrowers' options was to sell all of the subject lots to Lennar Homes under a takedown schedule (which had not yet been negotiated) was unfounded given Lennar's actions and public statements.  The credit memo's assertion that another option was that another national builder might purchase the 51 lots was speculative and highly unlikely, particularly given the credit memo's statement that the Lennar model at the subdivision opened in April 2007 and only two contracts had been written to date.

95.     The financial analysis clearly pointed out that borrowers E-1 and E-2 each had $0 accessible net worth due to their contingent liabilities on 11 other subdivision projects.  Loan E violated the Loan Policy that requires applicants for complex financing arrangements or commercial customers to provide sufficient, dependable and current financial information, including income and contingent liability data that supports repayment of the credit.  Although the Borrowers listed 11 other subdivision projects as equally owned business partnerships, they listed no contingent liabilities for these projects.

96.     The guarantors also added no strength to Loan E.  The financial analysis outlined the structure of the guarantors and acknowledged that the borrowers E-1 and E-2 utilized E-5 to support their personal finances.  E-5 was a management entity that handled the pre-development work and overhead associated with the borrowers'

residential and commercial real estate projects.  E-5 had shown an operating loss of $695,000 in 2004 and $758,000 in 2005 because it had not been reimbursed for overhead and expenses incurred by related entities.  The financial analysis also noted that despite E-5's net losses, E-1 and E-2, the principals of E-5, still took substantial distributions out of E-5 in order to pay personal income taxes for lot sales and bulk sales income that was generated in their personal names, various limited liability companies, or other corporations.

97.     The Loan also violated the Loan Policy in that E-5 did not provide updated current financial information.  Although the Loan was approved in July 2007, the latest financial information provided by E-5 was a 2005 tax return.  No current financial statement for E-5 was provided.  Guarantors E-3 and E-4 were new entities for which no financial statements were provided.  Defendants also violated the Loan Policy requirement that in loans to closely-held companies, persons who own in excess of 25 percent of the business should furnish a personal guaranty.

98.     Loan E also did not comply with the Loan Policy requirement that loans involving raw land be limited to a 65 percent LTV ratio.  The loan submission sheet stated that approval of the loan is conditioned upon receipt of an appraisal of the subject property that does not exceed 65 percent LTV.  But, the appraisal for the property calculated its value as $3,300,000, resulting in a 78 percent LTV ratio ($2,600,000 loan/$3,300,000 value).

99.     Borrowers E-1 and E-2 defaulted on Loan E and did not repay the loan in full.

#484637

100.    The deficient underwriting, credit analysis and Loan Policy violations on Loan E were apparent from the credit memo, financial analysis and loan submission sheet provided to the Loan Committee.  Had the recommending and approving Defendants Taylor and Marsiglia done their due diligence and insisted on the required underwriting and credit analysis, it would have demonstrated, among other things, that there was no adequate source of repayment and no adequate source of collateral, that the repayment sources identified were speculative and vulnerable to a deteriorating real estate market, that the borrowers' and guarantors' credit worthiness did not support the loan amount and that the LTV ratio of the subject property violated the Loan Policy.  As such, Loan E should not have been recommended or approved.

101.    In recommending and/or approving Loan E, Defendants failed to perform their duties, with reckless disregard for the consequences, by failing to comply with the Bank's lending policies, prudent underwriting and their own fiduciary duties.  As a direct and proximate result of the actions and omissions of Defendants Taylor and Marsiglia with respect to Loan E, the Bank suffered damages in an amount estimated to be no less than $575,000.

**vi.    Loan F**

102.    On September 26, 2007, Taylor recommended and Arthur, Marsiglia, and Mitchell approved a $5,760,000 million participation loan ("Loan F") to F-2, a corporation owned by guarantor F-3 (50 percent) and his son, guarantor F-5 (50 percent). Bradford participated in 65.35 percent of Loan F, for a total amount of $3,764,160. Defendants later substituted an affiliated corporation (F-1) as borrower in lieu of F-2.  F-1, a newly created corporation, was owned by F-3 (25 percent), F-3's wife, F-5 (25

percent); and F-4 (50 percent).  The proceeds of the loan were to be used to finance up to 55 percent of the land acquisition and up to 100 percent of the cost of development of a 12.2-acre parcel of land in Baltimore County, Maryland.  The stated sources of repayment were proceeds from (1) the sale of new homes to be built; and (2) sale of lots to another builder.  Loan F was to be secured by a first lien on the 12.2-acre parcel and unsecured guaranties from F-2, F-3, F-4 and F-5.

103.    The credit memo and the accompanying financial analysis provided widely divergent assessments of the strengths and weaknesses of borrower F-1 and the guarantors.  The discrepancies between the credit memo and the financial analysis required that any reasonable officer and/or director decline to recommend and/or approve Loan F.

104.    The Loan F credit memo indicated that equity would be provided in the form of a $325,000 cash deposit that F-2 has with the seller of the land and a fully subordinated seller note for the remaining $1,607,000.  However, the loan submission sheets stated that the seller take-back financing was actually only $1,300,000.

105.    Loan F also failed to comply with the Loan Policy in that there was insufficient information to establish the credit worthiness of the borrower and guarantors.  According to the loan submission sheet, the loan proceeds were to be disbursed for the following purposes: $2,681,000 for land acquisition, $1,964,000 for construction, and $1,115,000 for use as an interest reserve and for various engineering and soft costs.  The credit memo provided that the borrower and guarantors would furnish equity in the amount of $325,000 in cash and a fully subordinated seller note for $1,607,000.  The credit memo identified four risks to the Bank in making a loan: interest rate increases,

reduction in the price of the finished lots, the price of finished houses, and location risk assessment. Despite these risks, the credit memo recommended approval of Loan F.

106.   The accompanying financial analysis cited several weaknesses in the review of the financial information provided by the borrower and guarantors. The financial analysis noted that guarantor F-2 had incurred a net loss of $310,000 as of July 2007. The interim July 2007 financial statement for F-2 reflected a net worth of only $1.03 million with liquid assets of only $500,000 in cash. F-2 also had increased its liabilities by $1,389,000 from 2006 to 2007. The financial analyst also noted that F-2's leverage ratio weakened from 2.8:1 to 5.1:1. Not surprisingly, the financial analysis revealed that F-2 had projected it would incur a loss in 2007.

107.   Borrower F-1 presented no financial statements or balance sheets for 2006 or 2007 because the company did not report any activity in 2006 and did not expect any activity until later in 2007. Because F-1 was a newly formed entity, it had no business activity or assets to act as a suitable repayment source on the loan

108.   The financial analysis noted that guarantor F-3 had $0 accessible net worth individually. However, the financial analysis referenced a joint personal financial statement for guarantor F-3 and his wife F-5, reporting a joint net worth of $9,754,000. The financial analysis determined that this joint net worth figure was too high because it did not include over $1.3 million in obligations under other loans. A glaring error occurred when Taylor approved the addition of F-5 as a guarantor. The commitment letter for Loan F makes no mention of F-5 being added as a guarantor, and F-5 never signed a guaranty at the loan closing, thereby precluding the Bank from utilizing the jointly held assets of F-3 and F-5 as a repayment source on the loan.

#484637

109.   The financial analysis calculated guarantor F-4's accessible net worth to be only $305,000 after the deduction of joint assets, including his personal residence and business partnership interests.   The financial analysis also noted that no liabilities and contingent liabilities were listed by F-4 even though the credit analyst was aware of a loan to F-1 that F-4 guaranteed with a balance due to Bradford of $273,000.   The financial analysis also pointed out that F-4 had failed to include $169,798 in letters of credit that he had guaranteed.

110.   Loan F also failed to comply with the Loan Policy requirement that borrowers and guarantors furnish two years of tax returns.   Although guarantor F-2 provided tax returns for 2004 and 2005, it had not completed and furnished the tax return for 2006.  Borrower F-1 also did not submit any tax returns.

111.   Taylor also recommended Loan F despite the sales history outlined in the appraisal of the subject property.  The appraisal showed that the 12.2-acre property was sold for $1,300,000 in 2004, and that 28 months later, the same property was worth $4,600,000, an appreciation of 253 percent in only two years and four months.   A reasonable person would have questioned the reliability of the new valuation.

112.   The credit memo also identified significant negative indicators relating to the credit request.  The credit memo stated that significant negative indicators were present in the housing market at the time, including a slow-down in sales value and an increase in marketing time associated with housing in the metropolitan area.   In particular, the credit memo pointed out a 21 percent decline of home sales in Maryland during the second quarter of 2007, the fifth worst in the nation.  Although these concerns

were raised in the credit memo, none of the Defendants raised any questions regarding the feasibility of adding new lots in a shrinking housing market.

113.    The stated primary and secondary sources of repayment for Loan F as reflected in the loan submission sheet were: (1) sale of homes to be built and (2) sale of lots to another builder.  While the credit memo indicated that the borrower planned to construct homes on the finished lots, there was no financing contemplated or approved for home construction in this credit.

114.    The most significant weakness identified in the financial analysis was the lack of financial information available at the time the loan was made.  The failure to supply current financial information violated the Loan Policy, which required applicants to provide sufficient, dependable and current financial information that supported the repayment of the credit.  In light of the absence of F-1 as a suitable repayment source and the potential for other unstated liabilities, the credit analyst did not properly calculate an accurate universal cash flow analysis (UCA).  All of the weaknesses relating to the borrower and guarantors noted above were readily apparent to the Defendants and any one of them should have stopped the loan request unless these issues were satisfactorily resolved or declined.  In the absence of additional information, Defendants should have declined the credit request for Loan F.

115.    Borrower F-1 defaulted on Loan F and did not repay the loan in full.

116.    The deficient underwriting, credit analysis and Loan Policy violations for Loan F were apparent from the credit memo, financial analysis and loan submission sheet.  Had Taylor, Mitchell, Marsiglia and Arthur performed their due diligence and insisted on the required underwriting and credit analysis, it would have demonstrated that

there was no adequate source of repayment and no adequate source of collateral, that the repayment sources identified were speculative and vulnerable to a deteriorating real estate market, that the borrower's and guarantors' credit worthiness would not support the loan amount, and that the collateral was vastly overvalued.  As such, loan F should not have been recommended or approved.

117.    In recommending and/or approving Loan F, Defendants failed to perform their duties, with reckless disregard for the consequences, by failing to comply with the Bank's lending policies, prudent underwriting and their own fiduciary duties.  As a direct and proximate result of the actions and omissions of Defendants Taylor, Arthur, Mitchell and Marsiglia with respect to Loan F, the Bank suffered damages in an amount estimated to be no less than $479,000.

viii.    **Loan G**

118.    On October 24, 2007, Taylor recommended and Arthur, Marsiglia, and Mitchell approved a $3.451 million participation loan ("Loan G") to G-1, a Maryland limited liability company.  Bradford participated in 35 percent of Loan G, in the total amount of $1,200,000.  The proceeds of the loan were to be used to acquire and develop 26 single-family detached residential building lots in the Marriott-Kirk property subdivision in the Woodlawn section of Baltimore County, Maryland.  The guarantors included G-2 and G-3, the two principals in G-1, as well as G-4, G-5 and G-6, entities controlled by principals G-2 and G-3.  G-2 and G-3 each held a 50 percent Class A member interest in G-4, G-5 and G-6, entities that developed or owned property.  The stated repayment source of the loan was the sale of the 26 single-family residential lots.

#484637

The loan presentation package does not identify any secondary or tertiary sources of repayment.

119.    Taylor and Marsiglia, Arthur and Mitchell overlooked flagrant red flags that, if properly reviewed and researched, according to the Loan Policy, would have resulted in Loan G not being approved.  The credit memo and the accompanying financial analysis provided widely divergent assessments of the strengths and weaknesses of borrower G-1 and overlooked other critical economic red flags.  The discrepancies between the credit memo and the financial analysis required that any reasonable officer and/or director decline to recommend and/or approve Loan G.

120.    The loan submission sheet displayed several obvious red flags.  First, the borrower was listed as TBD (a to-be formed single purpose entity). TBD was scratched out on the sheet and replaced with a handwritten notation identifying G-1 as the borrower.  No summary financial information about G-1 was provided on the loan submission sheet.  The loan submission sheet made no mention of guarantor G-6, which was created after the loan was approved.  Neither borrower G-1 nor guarantor G-6 furnished financial statements to the Bank in violation of the Loan Policy.  The Loan Policy also required a 75 percent loan-to-discounted value ("LTDV") limitation on the collateral in Loan G.  However, the loan submission sheet stated that the LTDV was 85 percent, $406,000 over the Loan Policy limit.  The loan submission sheet did not reveal any extenuating circumstances or factors to demonstrate why the 75 percent LTDV limit should be waived in Loan G.

121.    Given public data documenting an economic slowdown in the housing industry, the credit memo contained several inconsistencies that should have prompted

-42-

greater scrutiny by the Loan Committee members before deciding whether to approve Loan G.  The credit memo stated that the equity to be furnished for the project was $452,000 in cash.  This statement directly contradicted the information in the loan submission sheet that states that equity was $674,000.

122.    Defendant Taylor also violated the terms of the Loan Policy by consenting to the removal of language in the Bank's commitment letter that weakened the cross default clause in the loan documents for Loan G.  The loan submission sheet required a cross default clause establishing that any default under any other Bank loan would constitute a default under Loan G.  But, Taylor permitted the removal of the cross default language from the Loan G loan documents, without obtaining any approval from the Loan Committee for this change.  The failure to present such a change to the Loan Committee constituted a violation of the Loan Policy.

123.    The financial analysis provided detailed information showing that the guarantors provided little strength to the request for Loan G.  Guarantors G-2 and G-3 each had accessible net worth of $0 and each had over $10 million in contingent liabilities.  Loan G violated the terms of the Loan Policy in that guarantors G-2 and G-3 failed to provide 2006 tax returns, thereby preventing the Bank from determining personal cash flow of the two principals involved in the loan.

124.    Guarantor G-4, a home seller, also exhibited substantial weaknesses including an increase in the days' supply of housing inventory from 1,588 days in 2005 to 1,846 in 2006.  Lot sales for G-4 totaled 148 in 2005, but only 17 in 2006.  The uniform cash flow (UCA) for G-4 revealed net cash flow after operations of negative $4,402,000 in 2006 versus $7,296,000 in 2005.  Guarantor G-5 was highly leveraged and had lower

cash ratios as compared to the RMA averages.   Similarly, guarantor G-5, the homebuilding division established by G-2 and G-3, reported a net loss of $177,000 for the first six months of 2007.  G-5's net worth decreased by $198,000 from approximately $1.5 million in December 2006, to $1.3 million in June 2007.  RMA analysis also revealed unfavorable comparisons of cash (5.3 percent versus 11.7 percent RMA) and debt to worth (9.5:1 versus 6.6:1 RMA) for G-5.  The UCA of guarantor G-5 showed net cash flow after operations of negative $838,000 in 2006 compared to $1,921,000 in 2005.  In addition, G-4 and G-5 presented interim financial statements dated June 2007 that appear to report $17.1 million in liabilities, and only $3.6 million in net worth.

125.    Loan G also violated the Loan Policy in that corporate guarantor G-5 failed to present a current, income statement prior to loan closing.

126.    Borrower G-1 defaulted on Loan G and did not repay the loan in full.

127.    The deficient underwriting, credit analysis and Loan Policy violations for Loan G were apparent from the loan submission sheet, credit memo and financial analysis provided by Taylor to the Loan Committee.  Had recommending and approving Defendants Taylor, Mitchell, Marsiglia and Arthur performed their due diligence and insisted on the required underwriting and credit analysis, it would have demonstrated, among other things, that there was no adequate source of repayment and no adequate source of collateral, that the repayment sources identified were speculative and vulnerable to a deteriorating real estate market, that the borrower's and guarantors' credit worthiness would not support the loan amount, and that the LTDV ratios exceeded the Loan Policy limits.  As such, Loan G should not have been recommended or approved.

#484637

128.    In recommending and/or approving Loan G, Defendants failed to perform their duties, with reckless disregard for the consequences, by failing to comply with the Bank's lending policies, prudent underwriting and their own fiduciary duties.  As a result of the actions and omissions of Defendants Taylor, Marsiglia, Mitchell and Arthur with respect to Loan G, the Bank suffered damages in an amount estimated no less than $556,000.

**E.    Summary of Negligent and Grossly Negligent Acts and Omissions**

129.    As exemplified through the Loss Transactions described above, Defendants repeatedly failed to comply with their duties as officers and/or directors of Bradford, and acted in a negligent and grossly negligent manner, including, but not limited to the following, all of which violated the Loan Policy and/or safe and prudent banking standards:

(a)    recommended and/or approved loans to borrowers without the financial capacity to repay the loans;

(b)    recommended and/or approved loans without properly determining the borrowers' capacity to service the debt, including lack of cash flow analysis;

(c)    recommended and/or approved collateral-based loans without requiring borrower equity in the underlying projects;

(d)    recommended and/or approved loans in excess of applicable LTV ratio limits; and

(e)    recommended and/or approved speculative ADC loans despite the known economic downturn at the time of loan approval.

#484637

130.    All conditions precedent to the bringing of this action have been satisfied or have been waived.

## V.    CLAIMS FOR RELIEF[3]

### COUNT I

### NEGLIGENCE OF ARTHUR, MARSIGLIA, AND MITCHELL

131.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-130, above, as if fully set forth in this Count.

132.    Under Maryland law, directors of banks may be held personally liable for the negligent breach of their duty of care.  Directors are required to act at least with the care of an ordinarily prudent person in a like position under similar circumstances. Moreover, directors of a bank owe fiduciary duties, individually and collectively, to exercise the highest degree of loyalty, care, diligence and fair dealing in the management, conduct, and direction of the business of the bank.

133.    Arthur, Marsiglia, and Mitchell were directors, and, in the case of Arthur, also an executive officer, of Bradford at all applicable times.  As such, they are personally liable for their negligent breaches of their duties of care.

134.    As directors and an executive officer of the Bank, at a minimum the Non-Officer Directors and Arthur owed duties to the Bank to conduct its business consistent with safe and sound lending practices.  These duties included, but were not limited to, the following:

---

[3]    Each of the following claims is an independent claim for relief.  To the extent necessary to rebut any assertion that one or more of these claims for relief is duplicative of another claim for relief herein, the FDIC-R alleges any such claim or claims in the alternative pursuant to Fed. R. Civ. P. 8(d)(2).

(a)     To attend the meetings of the Board of Directors and the Loan Committee and to actively review and approve or disapprove each loan and/or investment; and

(b)     To take such action as necessary to ensure that the Bank's loans and investments were underwritten and approved in accordance with the Loan Policy and with the law, regulations, and policies applicable thereto and in accordance with sound and prudent banking practices.

135.    The Non-Officer Directors and Arthur breached their duties and were negligent by, inter alia, voting to approve Loans A through G as referenced herein and through acts and omissions, such as those referenced herein and by:

(a)     Extending credit in violation of the Loan Policy;

(b)     Providing financing for speculative ventures in which the borrowers invested little or no money of their own;

(c)     Extending credit to borrowers who were not creditworthy or were known to be in financial difficulty;

(d)     Extending credit based on inadequate information concerning the financial condition of prospective borrowers and guarantors and without adequately analyzing cash flow, debt service coverage, and other critical financial information;

(e)     Renewing improperly made and approved loans without updated information on the borrower, guarantors or collateral; and

(f)     Ignoring, failing to consider or disregarding (i) the Loan Policy, (ii) rules and regulations governing approval of loans, (iii) financial information that was stale or reflected a lack of credit worthiness of the borrowers and guarantors, (iv) missing information from the loan presentation packages, and (v) sound and prudent banking practices.

136.    As a direct and proximate result of the negligence of Arthur and the Non-Officer Directors, Plaintiff has suffered damages in an amount to be shown at trial, but not less than $7 million.

## COUNT II

## GROSS NEGLIGENCE OF ARTHUR, MARSIGLIA, AND MITCHELL

137.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-136, above, as if fully set forth in this Count.

138.    Arthur, Marsiglia, and Mitchell were directors, and, in the case of Arthur, also an executive officer, of Bradford at all applicable times.

139.    Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") holds directors and officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law.  Under Maryland law, gross negligence is defined as a failure to perform a duty with reckless disregard for the consequences. *Billman v. Md. Deposit Ins. Fund Corp.*, 592 A.2d 684, 697 (Md.App. 1991).

#484637

140.    The acts and omissions of the Non-Officer Directors and Arthur described in this Complaint demonstrate they exercised their duties to the Bank with reckless disregard for the consequences.

141.    As directors and an executive officer of the Bank, the Non-Officer Directors and Arthur owed duties to the Bank to exercise the degree of care, skill, and diligence that ordinarily prudent persons in like positions would use under similar circumstances, and to do so with regard for the consequences.  Moreover, the Non-Officer Directors and Arthur owed fiduciary duties, individually and collectively, to exercise the highest degree of loyalty, care, diligence and fair dealing in the management, conduct, and direction of the business of Bradford.  The duties owed by the Non-Officer Directors and Arthur included, but were not limited to, the following:

(a)    To attend the meetings of the Board of Directors and the Loan Committee and to actively review and approve or disapprove each loan and/or investment; and

(b)    To take such action as necessary to ensure that the Bank's loans and investments were underwritten and approved in accordance with the Loan Policy and with the law, regulations, and policies applicable thereto and in accordance with sound and prudent banking practices.

142.    The Non-Officer Directors and Arthur breached their duties and were grossly negligent in that they failed to perform their duties, with reckless disregard for the consequences of their actions and omissions, by, inter alia, voting to approve Loans A through G as referenced herein and through acts and omissions, such as:

-49-

(a)     Extending credit in violation of the Loan Policy;

(b)     Providing financing for speculative ventures in which the borrowers invested little or no money of their own;

(c)     Extending credit to borrowers who were not creditworthy or were known to be in financial difficulty;

(d)     Extending credit based on inadequate information concerning the financial condition of prospective borrowers and guarantors and without adequately analyzing cash flow, debt service coverage, and other critical financial information;

(e)     Renewing improperly made and approved loans without updated information on the borrower or collateral; and

(f)     Ignoring, failing to consider or disregarding (i) the Loan Policy, (ii) rules and regulations governing approval of loans, (iii) financial information that was stale or reflected a lack of credit worthiness of the borrowers and guarantors, (iv) missing information from the loan presentation packages, and (v) sound and prudent banking practices.

143.     As a direct and proximate result of the gross negligence of Arthur and the Non-Officer Directors and their failure to perform their duties, with reckless disregard of the consequences of their actions and omissions, Plaintiff has suffered damages in an amount to be shown at trial, but not less than $7 million.

#484637

## COUNT III

### NEGLIGENCE OF TAYLOR

144.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-143 above as if fully set out in this Count.

145.    Under Maryland law, a bank officer is required to act at least with the care of an ordinarily prudent person in a like position under similar circumstances in the conduct of the a bank's business and financial affairs.  Officers of a bank owe fiduciary duties, individually and collectively, to exercise the highest degree of loyalty, care, diligence and fair dealing in the management, conduct, and direction of the business of the bank.  As an officer, Taylor owed the Bank a duty to use at least reasonable care, skill, and diligence in the performance of her duties.  As an officer, Taylor further owed to Bradford a fiduciary duty to act in the best interests of Bradford, in good faith, and with the utmost care in the performance of her duties.  This included, among other duties, conducting the business of Bradford in a manner consistent with safe and sound lending practices, using reasonable and prudent procedures for underwriting loans, recommending approval of loans in accordance with the Loan Policy, and providing the Loan Committee with adequate, complete, and accurate information regarding all aspects of proposed loans.  This information included, among other things, the value and sufficiency of collateral, the financial creditworthiness of each borrower and guarantor, the LTV ratio of any real estate loan, and any other information necessary to ensure that proposed loans complied with the Loan Policy and prudent lending practices.  Among other things, Taylor was responsible for ensuring that Bradford closed and funded loans

according to the terms approved by the Loan Committee and in accord with the Loan Policy and prudent lending practices.

146.     Taylor routinely and repeatedly failed to conduct and direct the business and affairs of Bradford in a manner consistent with its Loan Policy and safe and sound principles of banking.  Taylor breached her duties and was negligent to the detriment of Bradford by, among other things:

(a)     Failing to follow reasonable, prudent, and sound procedures for underwriting loans;

(b)     Causing Bradford to approve and fund loans in violation of its Loan Policy and prudent lending practices;

(c)     Causing Bradford to approve and fund loans without adequately analyzing borrowers' abilities to service the loans;

(d)     Causing Bradford to approve and fund participation loans notwithstanding a lack of independent underwriting;

(e)     Causing Bradford to approve and fund speculative ADC and CRE loans notwithstanding a known economic downturn;

(f)     Causing Bradford to approve and fund loans without requiring adequate sources of repayment;

(g)     Causing Bradford to approve and fund loans without performing an adequate cash flow analysis or any analysis at all;

(h)     Failing to ensure that loans closed according to the terms approved;

(i)     Causing Bradford to approve and fund ADC and CRE loans without current financial information on the prospective borrower and guarantors;

(j)     Failing to provide full and complete credit information on prospective borrowers and guarantors;

(k)     Causing Bradford to approve and fund ADC and CRE loans in which the borrower provided little to no cash equity in the project;

(l)     Causing Bradford to approve and fund unreasonably and imprudently structured loans; and

(m)     Ignoring, failing to consider or disregarding (i) the Loan Policy, (ii) rules and regulations governing approval of loans, (iii) financial information that was stale or reflected a lack of credit worthiness of the borrowers and guarantors, (iv) missing information from loan presentation packages, and (v) sound and prudent banking practices.

147.    As a direct and proximate result of Taylor's negligence, Plaintiff suffered damages in an amount to be shown at trial, but not less than $7 million.

## COUNT IV

## GROSS NEGLIGENCE OF TAYLOR

148.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-147 above as if fully set out in this Count.

149.    Under Maryland law, gross negligence is defined as a failure to perform a duty with reckless disregard for the consequences.

#484637

150.    As an officer, Taylor owed the Bank a duty to use at least reasonable care, skill, and diligence in the performance of her duties and to do so with regard for the consequences.  As an officer, Taylor further owed to Bradford a fiduciary duty to act in the best interests of Bradford, in good faith, and with the utmost care in the performance of her duties.  This included, among other duties, conducting the business of Bradford in a manner consistent with safe and sound lending practices, using reasonable and prudent procedures for underwriting loans, recommending approval of loans in accordance with the Loan Policy, and providing the Loan Committee with adequate, complete, and accurate information regarding all aspects of proposed loans.  This information included, among other things, the value and sufficiency of collateral, the financial creditworthiness of each borrower and guarantor, the LTV ratio of any real estate collateral, and any other information necessary to ensure that proposed loans complied with the Loan Policy and prudent lending practices.  Among other things, Taylor was responsible for ensuring that Bradford closed and funded loans according to the terms approved by the Loan Committee and in accordance with the Loan Policy and prudent lending practices.

151.    Taylor routinely and repeatedly grossly failed to conduct and direct the business and affairs of Bradford in a manner consistent with its Loan Policy and safe and sound principles of banking, with reckless disregard for the consequences of her actions and omissions.  Taylor regularly and consistently failed to consider or disregarded her duties, was grossly negligent to the detriment of Bradford by, among other things:

> (a)    Failing to follow reasonable, prudent, and sound procedures for underwriting loans;

(b)     Causing Bradford to approve and fund loans in violation of its Loan Policy and prudent lending practices;

(c)     Causing Bradford to approve and fund loans without adequately analyzing borrowers' abilities to service the loans;

(d)     Causing Bradford to approve and fund participation loans notwithstanding a lack of independent underwriting;

(e)     Causing Bradford to approve and fund speculative ADC and CRE loans notwithstanding a known economic downturn;

(f)     Causing Bradford to approve and fund loans without requiring adequate sources of repayment;

(g)     Causing Bradford to approve and fund loans without performing an adequate cash flow analysis or any analysis at all;

(h)     Failing to ensure that loans closed according to the terms approved;

(i)     Causing Bradford to approve and fund ADC and CRE loans without current financial information on the prospective borrower;

(j)     Failing to provide full and complete credit information on prospective borrowers and guarantors;

(k)     Causing Bradford to approve and fund ADC and CRE loans in which the borrower provided little to no cash equity in the project;

(l)     Causing Bradford to approve and fund unreasonably and imprudently structured loans; and

#484637

(m)   Ignoring, failing to consider or disregarding (i) the Loan Policy, (ii) rules and regulations governing approval of loans, (iii) financial information that was stale or reflected a lack of credit worthiness of the borrowers and guarantors, (iv) missing information from loan presentation packages, and (v) sound and prudent banking practices.

152.   As a direct and proximate result of Taylor's gross negligence and failure to perform her duties, with reckless disregard of the consequences of her actions and omissions, Plaintiff suffered damages in amount to be shown at trial, but not less than $7 million.

## VI.   RELIEF REQUESTED

WHEREFORE, Plaintiff Federal Deposit Insurance Corporation as Receiver for Bradford Bank demands judgment in its favor and against Defendants jointly and severally, as follows:

A.   For compensatory and other damages as a result of Defendants' actions and omissions in an amount to be proven at trial;

B.   For prejudgment interest pursuant to Maryland law and 12 U.S.C. § 1821(l);

C.   For costs and attorneys' fees incurred by the FDIC-R in connection with this proceeding; and

D.   For such other and further relief that this Court deems just and proper.

## VII.   JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the FDIC-R demands a trial by jury on all claims.

#484637

Respectfully Submitted,


/s/ Ward B. Coe, III
Ward B. Coe, III – Fed. Bar. No. 00282
Matthew W. Oakey– Fed. Bar No. 10764
Hillary H. Arnaoutakis– Fed. Bar No. 28808
GALLAGHER EVELIUS & JONES LLP
218 North Charles Street, Suite 400
Baltimore, MD 21201
Telephone: (410) 727-7702
Facsimile: (410) 468-2786
wcoe@gejlaw.com
moakey@gejlaw.com
harnaoutakis@gejlaw.com

***Attorneys for the Federal Deposit Insurance Corporation as Receiver for Bradford Bank***

#484637